STATE of Missouri, Plaintiff–
Respondent,

v.

Barry TALKINGTON, Defendant–
Appellant.

Barry TALKINGTON, Movant–Appellant,

v.

STATE of Missouri, Respondent–
Respondent.

Nos. 17727, 18288.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 2, 1993.

Brad B. Baker, Office of the State Public Defender, Columbia, for defendant-appellant, and movant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Millie A. Aulbur, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent, and respondent-respondent.

SHRUM, Judge.

The defendant was found guilty by a jury of first degree robbery and armed criminal action and sentenced by the court as a prior and persistent offender to concurrent terms of imprisonment of 18 and 10 years, respectively. He appeals in Case No. 17727.

The defendant sought postconviction relief under Rule 29.15. After an evidentiary hearing, the motion court denied relief, and the defendant appeals in Case No. 18388.

The appeals are consolidated for our review. We affirm the judgment in each case.

CASE NO. 17727

*Facts*

We briefly recite facts that support the conviction and are relevant to the defendant's first point on appeal.

At the time of the incident, the victim, Beatrice Perkins, was living alone about two miles north of Catron, in rural Stoddard County. At about 12:30 a.m., January 18, 1990, the victim awakened to discover her bedroom ceiling light was on and the defendant was standing in the bedroom holding a crowbar in his hand. The defendant told the victim she would be "all right" and asked her where her money, guns, and jewelry were.[1]

The victim sat up on the side of the bed and put on her housecoat that had been on a bedside chair. She "felt something" on her neck that she discovered was blood and then noticed there was blood "all over the floor by my bed."[2] She used a paper towel from the pocket of her housecoat in an attempt to stop her bleeding. The defendant, who was rummaging through dresser drawers, was aware that the victim was bleeding.

When the paper towel became saturated, the victim told the defendant she needed to go to the bathroom to get a washcloth. He told her to stay on the bed, but she "just pushed behind him" and went to the bathroom. The defendant followed her and struck the plywood wall "close to the door"[3] with the crowbar knocking a hole in the wall.

1. On cross examination, the victim was asked if the defendant said, "[I]t's going to be okay. I just want your guns and your money and your stuff." The victim replied, "That's what he said."

2. The victim later testified the defendant had "an injury or something" and that he was "dripping [blood] all over everything."

3. Presumably the bathroom door, although it is unclear from the record filed with this court precisely where the defendant struck the wall with the crowbar.

After the victim obtained a washcloth, the defendant "insisted" she return to the bedroom and sit on the bed. She complied. He resumed his search through the victim's drawers and closets, still holding the crowbar.

When the washcloth became saturated with blood, the victim told the defendant she was going to the bathroom to rinse it. When he did not follow her, she left the house through a back door, in her words, "running for my life." As she was escaping, she heard the defendant call to someone in another part of the house, "She's outside. Catch her at the side of the house."

The victim ran to the barn with the defendant in pursuit. The defendant chased the victim around the barn, and then the victim ran into a field where she hid by lying in the mud behind some milo stalks. She heard the defendant call to someone to "bring the truck and back it in." She remained hidden in the field until she saw the truck depart. Then she walked to the home of neighbors who drove her to a hospital in Sikeston where she received five stitches to close a cut on her cheek.

When she returned home she discovered the defendant's crowbar on the dresser in her bedroom and that a rifle, a handgun, and money were missing.

Investigation led to the arrest of the defendant who was charged with first degree robbery and armed criminal action.

The jury found the defendant guilty of both counts. Having found the defendant to be a prior and persistent offender, the court assessed punishment.

### Discussion and Decision

 In his first point on appeal, the defendant challenges the sufficiency of the evidence to support the verdict on the robbery count. We consider the evidence and all inferences reasonably drawn therefrom in the light most favorable to the verdict and disregard all contrary evidence and inferences. The test is whether the evidence, so viewed, was sufficient to make a submissible case from which rational jurors could have found beyond a reasonable doubt that the defendant was guilty. *State v. Keeler*, 856 S.W.2d 928, 930 (Mo. App.S.D.1993).

 The state has the burden of proving "each and every element" of a criminal offense. *Keeler*, 856 S.W.2d at 930. The elements of robbery in the first degree, a class A felony, are found in § 569.020,[4] where the crime is defined as follows:

1. A person commits the crime of robbery in the first degree when he forcibly steals property and in the course thereof he, or another participant in the crime,

(1) Causes serious physical injury to any person; or

(2) Is armed with a deadly weapon; or

(3) Uses or threatens the immediate use of a dangerous instrument against any person; or

(4) Displays or threatens the use of what appears to be a deadly weapon or dangerous instrument.

In his brief on appeal the defendant concedes he stole the victim's property and he does not challenge the conclusion that, at a minimum, his display of a dangerous instrument satisfied § 569.020.1(4). He limits his complaint to his contention that the state presented no evidence that his theft of the victim's property was "forcibly" accomplished as required by the introductory portion of § 569.020.1.

The term *forcibly steals* as used in the first-degree and second-degree[5] robbery statutes is defined in pertinent part in § 569.010 as follows:

(1) [A] person "forcibly steals", and thereby commits robbery, when, in the

---

4. All statutory references are to RSMo 1986.

5. Second degree robbery is defined in § 569.030 as follows:

1. A person commits the crime of robbery in the second degree when he forcibly steals property.

course of stealing,[6] as defined in section 570.030, RSMo, he uses or threatens the immediate use of physical force upon another person for the purpose of:

(a) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking. . . . [7]

In *State v. Duggar*, 710 S.W.2d 921 (Mo. App.1986), this court observed that "the force necessary to constitute robbery may be constructive as well as actual, and may consist in the intimidation of the victim, or putting him in fear." *Id.* at 922. The *Duggar* court affirmed the second degree robbery conviction of a defendant who told a convenience store clerk he wanted all the money in the cash register and confirmed for the clerk that he "was serious." *Id.* at 921–22. The defendant Duggar "did not offer physical violence, did not display any weapon and made no threats." *Id.* at 922. The clerk said he "felt threatened." *Id.*

In *State v. Clark*, 790 S.W.2d 495 (Mo. App.1990), the court upheld the second degree robbery conviction of a defendant who handed a fast food restaurant employee a note "to the effect that it was a hold-up and to give him the money out of the register." *Id.* at 495–96. The defendant did not display a weapon, did not exert any force on the employee, and did not threaten her, although she said she "thought the note was a threat." *Id.* at 496. The court held that, under the circumstances, the message in the note was "at least a threat to use immediate physical force for the purpose of compelling the employee to deliver up the money from the cash register." *Id.* at 497.

Here, the victim awakened to find a stranger wielding a crowbar, a tool not normally associated with rifling through personal belongings in drawers and closets. The defendant ordered the victim to stay on the bed, and she had to push behind him

to get to the bathroom to obtain a washcloth. The defendant followed her to the bathroom and struck the wall with the crowbar, knocking a hole in it. The defendant then insisted the victim return to the bedroom and sit on the bed, and he resumed his search for booty, all the while holding the crowbar.

From this evidence and reasonable inferences therefrom, the jury could have found beyond a reasonable doubt that the defendant threatened the immediate use of physical force upon the victim for the purpose of preventing her resistance to his taking of her property. His use of force in her presence gave her a clear message that constituted a threat that he would immediately use physical force on her. *See Clark*, 790 S.W.2d at 497. That threat was sufficient to intimidate the victim and put her in fear. *See Duggar*, 710 S.W.2d at 922. The victim's flight from her home into the field, where she lay in the mud until the defendant and his cohort departed, and her statement that she was "running for my life" bear witness that the defendant's acts intimidated and frightened her.

Undaunted by the evidence that supports the conviction, the defendant attempts to paint himself a benign burglar whose sole objective was a simple theft. Thus he points to the victim's testimony that he assured her she would be "all right" and "okay" and that he just wanted her guns, jewelry, and money. This line of argument is without merit. Indeed, the defendant's conditional assurances to the victim that she would be "all right" and "okay" if she complied with his orders to stay on the bed and tell her where her belongings were could be viewed as a veiled threat against her.

■ The defendant asserts in his brief that the victim "acknowledged that at no time did appellant threaten her, either ver-

6. "[I]n the course of stealing" is a broad phrase that covers the entire transaction or occurrence. Thus if the use of force or the threat of the immediate use of force precedes or is contemporaneous with the taking, the offense of robbery is complete. *State v. Yancy*, 779 S.W.2d 712, 714–15[3, 5] (Mo.App.1989).

7. Paragraph third of the verdict directing instruction on the first degree robbery count, an instruction drawn from MAI–CR3d 323.02, hypothesized the defendant's purpose to be "preventing resistance to the taking of the property. . . ."

bally or physically." We find no such acknowledgement by the victim in the transcript of her testimony. Although the victim testified the defendant did not "grab" her, did not prevent her from going to the bathroom, and "never touched me," such evidence does not negate the evidence that supports the conclusion that the defendant did threaten her with the immediate use of force.

The defendant also calls our attention to the lack of evidence that the cut on the victim's cheek was the result of the defendant's striking her with the crowbar. We have not considered the existence or possible cause of the cut to be a factor in our conclusion that the state made a submissible case.[8]

■ In a separate point relied on, the defendant contends the trial court erred in giving Instruction 4, patterned after MAI–CR3d 302.04, that defined "proof beyond a reasonable doubt" as "proof that leaves you firmly convinced of the defendant's guilt." He contends the definition allowed the jury to convict him "based upon a degree of proof that was below that required by the due process clause." Point denied. *See State v. Stevenson,* 852 S.W.2d 858, 864 (Mo.App.1993); *State v. Vanzant,* 814 S.W.2d 705, 708[4] (Mo.App.1991).

The judgment of conviction in Case No. 17727 is affirmed.

### CASE NO. 18388

■ The defendant filed a *pro se* motion under Rule 29.15 seeking postconviction relief. Appointed counsel filed an amended motion. In the motions, the defendant alleged, among other matters, that his trial counsel was ineffective because she failed to offer into evidence the victim's medical records and testimony of physicians who treated the cut on her cheek. The motion court conducted an evidentiary hearing and denied relief.

The defendant now argues that "any evidence available to defense counsel showing

[the victim's] wound was not severe enough to have been inflicted by the crowbar would have been helpful in challenging the sufficiency of the state's evidence on the element of force."

As we have discussed, the state made a submissible case without consideration of the cause of the injury to the victim. Therefore, trial counsel's failure to offer medical evidence concerning the cause of the cut on the victim's cheek, if error, did not prejudice the defendant's defense. The defendant's claim of ineffective assistance thus fails. *Strickland v. Washington,* 466 U.S. 668, 691–92, 104 S.Ct. 2052, 2066–67[15], 80 L.Ed.2d 674 (1984); *Richardson v. State,* 719 S.W.2d 912, 915[1], 916[7] (Mo.App.1986).

The judgment in Case No. 18388 is affirmed.

PARRISH, C.J., and MONTGOMERY, J., concur.

*Grim,* 854 S.W.2d 403 (Mo.banc No. 74892, May 25, 1993), in which the court abolished the "circumstantial evidence rule." *Id.* at 405–408.