**STATE of Missouri, Respondent,**

v.

**Leo T. McLAUGHLIN, Appellant.**

**No. 73468.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Feb. 16, 1999.

Rehearing Denied April 7, 1999.

Alan G. Kimbrell, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Daniel W. Follett, Asst. Atty. Gen., Jefferson City, for respondent.

LAWRENCE G. CRAHAN, Judge.

Leo McLaughlin ("Defendant") appeals the judgment and sentence entered upon his conviction by a jury of tampering with a witness in violation of section 575.270.1 RSMo 1994. We affirm.

Defendant's first point challenges the sufficiency of the evidence to support his conviction. In determining the sufficiency of the evidence to support the conviction, we review the evidence, together with all reasonable inferences to be drawn therefrom, in the light most favorable to the guilty verdict. *State v. Grim*, 854 S.W.2d 403, 405 (Mo.banc 1993). We disregard all evidence and inferences to the contrary. *Id.*

On July 2, 1995, Defendant, Larry Callanan, Lisa Schaefer and K.W. ("Victim") spent the evening together attending the VP Fair and visiting various parties. As the four were driving to the fair, Defendant or Callanan offered the girls acid, which they declined. After the fair, the foursome went to a party in North St. Louis County. John Schuh was at the party. Victim noticed Defendant and Callanan whispering and laughing every time Schuh walked away. When Victim asked Defendant why they didn't like Schuh, he told her to "shut up" and said some questions should remain unanswered. During the party, Lisa Schaefer was taken home.

Victim later drove Defendant, Callanan and Schuh to another party where Callanan had left his truck. Callanan and Defendant were going to take Schuh home in Callanan's truck. On the way to the party, Callanan instructed victim to stop briefly at his home.

Callanan entered his home and when he returned to the vehicle, Victim noticed that his shirt was no longer tucked in. When they arrived at the party, Defendant, Callanan and Schuh got out of the vehicle and Victim drove away.

As she was driving away, Victim heard four or five gunshots. She turned around and saw Callanan drive away from the party with his lights off. Victim saw Defendant and asked him what had happened, Defendant said, "Larry just did something stupid. Take me home." After driving a short distance, Defendant told Victim to turn around and return to the party, telling Victim, "They would find us anyway." When they returned to the party, Victim saw Schuh lying on the porch apparently shot to death.

Victim testified about the events of July 2, 1995, before a grand jury. Victim testified that she was offered acid, that she saw Callanan drive away with his lights off and that Defendant told her that Callanan had done something stupid. The grand jury charged Callanan with the murder of Schuh.[1] While Callanan was in the county jail awaiting trial, his attorney provided him with a copy of Victim's grand jury testimony. Callanan informed Defendant about the substance of Victim's testimony.

On January 1, 1996, Defendant called Schaefer and told her he needed to see her. Later that day, Schaefer went to Defendant's home. While she was there, Callanan called Defendant from the county jail. Defendant told him, "Lisa is sitting here." Schaefer said the call was brief and that during the call, she heard Defendant say, "Yes. Yes. Uh-uh, uh-uh. Right away." Defendant hung up the phone and told Schaefer, "That was Larry. He said hi. He wanted to know if I talked to you yet about talking to [Victim] about her talking one-on-one with Larry's attorney." Schaefer told Defendant that she didn't think Victim would speak one-on-one with Callanan's attorney.

Defendant then began to discuss the Callanan family with Schaefer. He told her Callanan's family was in the mafia and that Cal-

---

1. Callanan's convictions for first degree murder and armed criminal action were affirmed by this court in *State v. Callanan,* 948 S.W.2d 678 (Mo. App.1997).

lanan's father had lost his legs in a car bombing. Defendant said Callanan's father would do anything for his son and that the Callanan family was "very capable of doing things." Defendant showed Schaefer a letter Callanan had sent him from jail. In the letter, Callanan said, "When I get home it's going to be strictly business."

Defendant told Schaefer that he had read Victim's grand jury testimony. He told Schaefer he was upset that Victim had testified that she and Schaefer had been offered acid. Defendant said he was also upset that Victim had told the grand jury that Defendant and Callanan did not like Schuh and that she had told the grand jury about his statement that, "Larry just did something stupid." Defendant said that these were minor details and that Victim's talking about these minor details would only hurt her.

Defendant told Schaefer she needed to ask Victim how much she loved her son. Victim's son was born in July, 1994. Schaefer testified that she immediately "freaked out." She had known Defendant for years and testified Defendant never said too much he didn't mean. Schaefer asked Defendant if he wanted her to scare Victim. He replied, "I don't want you to scare her, I want you to sit down with her and ask her how much she loves her child. As much as I hate to see a woman or child get hurt, anything's possible." Three more times Schaefer asked Defendant what he meant and did he want her to scare Victim. Each time Defendant said, "I want you to sit down with her and ask her how much she loves her son." Defendant again said that Callanan's father would do anything for his son and that was why Schaefer should sit down with Victim and ask her how much she loved her son.

When Schaefer left Defendant's home she was scared. She didn't know how to handle the situation. The next day she called Victim and told her everything Defendant had said. Victim told her father and her father called the police.

Section 575.270.1, RSMo 1994 provides:

1. A person commits the crime of "tampering with a witness" if, with the purpose to induce a witness or a prospective witness in an official proceeding to disobey a subpoena or other legal process, or to absent himself or avoid subpoena or other legal process, or to withhold evidence, information or documents, or to testify falsely, he:

(1) threatens or causes harm to any person or property; or

(2) uses force, threats or deception; or

(3) offers, confers or agrees to confer any benefit, direct or indirect, upon such witness; or

(4) conveys any of the foregoing to another in furtherance of a conspiracy.

■ Defendant's first point is a bifurcated attack on the submissibility of the State's case. First, Defendant urges that the evidence is insufficient to support a finding that he sought to have Victim "testify falsely." Although he concedes that the evidence would be sufficient to support a finding that he sought to have Victim "withhold evidence," which is also proscribed by section 575.270.1, Defendant urges that both the information upon which he was tried and the instruction submitted to the jury specifically required that he acted with the purpose of inducing Victim to "testify falsely." Therefore, Defendant reasons, even if the evidence was sufficient to prove a violation of the statute by seeking to influence Victim to withhold evidence, this was not the intent charged or submitted to the jury and the State therefore failed to make a submissible case. We disagree with Defendant's premise.

The flaw in Defendant's logic is that it overlooks the fact that Victim had already testified once before the grand jury when Defendant made his threats. Having already discussed under oath the topics Defendant sought to suppress, the jury could quite reasonably infer that the way Defendant intended Victim to comply with his demand not to talk about such things was to somehow falsely recant her prior testimony, either to the grand jury or at Callanan's trial. Thus, the evidence was sufficient to support a finding that Defendant sought to have Victim "testify falsely."

Defendant further claims the State failed to make a submissible case because it failed to prove that any of the three topics he sought to suppress were material in proving the murder charge lodged against Callanan. The short answer to this contention is that the statute contains no such requirement. If the legislature had intended to require the State to prove that the information sought to be suppressed was or would be material, it presumably would have set forth such a requirement in the statute, as it has for other crimes. *See, e.g.* Section 575.040 RSMo 1994 (perjury). Moreover, to judicially engraft a materiality requirement would be inconsistent with the recognized purpose of the statute. As the court stated in *State v. Hedge*, 793 S.W.2d 478, 480 (Mo.App.1990), "anything which obstructs the procurement of witnesses, or, once procured, which hinders their freedom and willingness to speak the truth before any court or body charged with the enforcement of our laws, civil or criminal, is an offense against the administration of justice and is within the contemplation of Chapter 575." Even if the information suppressed may ultimately prove to be immaterial, the damage to the system lies in depriving the proper authorities of the opportunity to make that judgment.

Imposing a materiality requirement would also likely mean that the State could not try a witness tampering case unless and until the proceeding in which the witness appeared had been concluded. In many cases, however, the underlying proceeding may be disposed of by some means other than a trial. Thus, unlike perjury cases, in which the context and materiality of the statement are already a matter of record, it could well be impossible for the State to prove whether the witness' testimony would even have been admissible. We find nothing in the statute to suggest the legislature intended the State to carry such a burden. Point denied.

Defendant's second point claims the trial court erred in overruling his objection to a portion of the State's closing argument. We have reviewed the transcript and find no error. An extended discussion would be of no precedential value. We deny this point pursuant to Rule 30.25(b).

Judgment affirmed.

JAMES R. DOWD, P.J., and RICHARD B. TEITELMAN, J., concur.