

# Missouri Court of Appeals

## Southern District

### Division One

STATE OF MISSOURI,      )
     )
     Respondent,      )
     )
vs.      )      No. SD35712
     )      Filed: September 26, 2019
DOYLE EDWARD HITCHCOCK,      )
     )
     Appellant.      )

### APPEAL FROM THE CIRCUIT COURT OF CHRISTIAN COUNTY

Honorable Jennifer R. Growcock, Judge

**<u>AFFIRMED</u>**

Doyle Edward Hitchcock ("Hitchcock") appeals his convictions of five counts of forcible sodomy, six counts of endangering the welfare of a child, and two counts of forcible rape. Hitchcock presents four points on appeal: points one and two challenge the sufficiency of the evidence; point three challenges the trial court's admission of uncharged misconduct; and point four challenges the admission of testimony relating to substantiation by the Children's Division of the Department of Social Services ("the Children's Division") of allegations against Hitchcock. Finding no merit to these points, we affirm the judgment of the trial court.

**Facts and Procedural Background**[1]

We set forth the evidence in the light most favorable to Hitchcock's convictions. *See **State v. McKinney***, 253 S.W.3d 110, 113 (Mo.App. W.D. 2008). We set out other information as necessary for context.

At age four, Victim and her two brothers moved from an Indian reservation in South Dakota to Springfield, Missouri, to live with Hitchcock and his wife. They subsequently moved to a house on four acres in Ozark, Missouri. Hitchcock physically, sexually, and emotionally abused Victim from 2006 (at which time Victim was eight years old) until 2013. Victim told her brothers about the sexual abuse, but they "didn't mind anything of it." Victim then disclosed the abuse to Hitchcock's wife, who "slapped [Victim] in the face and called [Victim] a liar and that [Hitchcock] couldn't do anything like that[.]"[2]

Victim also disclosed the abuse to "a couple of [her] friends." One of these friends encouraged her to talk to that friend's mother, or the school counselor. Victim refused, and told the friend not to tell anyone as Hitchcock "told [her] not to tell anybody[,]" and threatened to "send us kids back to the Res[ervation] if [Victim] was to tell anybody what he was doing." Victim's

---

[1] Rule 84.04(c) requires that an appellant present the reviewing court with "a fair and concise statement of the facts relevant to the questions presented for determination without argument." *Interest of R.J.M.*, 571 S.W.3d 219, 222 (Mo.App. S.D. 2019). Hitchcock's facts are not "fair," in that they do not screen for the adverse credibility determinations below; and his facts are not "concise," in that they do not screen for material ***actually relevant*** to his instant challenge. The requirements of Rule 84.04(c) reflect the controlling principle of review that "[a]n appellant may not simply recount his or her version of the events, but is required to provide a statement of the evidence in the light most favorable to the judgment." *Id.* Rather, "[t]he function of the appellant's brief is to explain to the court why, despite the evidence seemingly favorable to the respondent, the law requires that appellant must prevail." ***Hoer v. Small***, 1 S.W.3d 569, 571 (Mo.App. E.D. 1999). "Our courts have observed that this manner of failure is often viewed as an admission that if all (and only) the relevant facts were before the reviewing court, the appellant would surely lose." *Interest of R.J.M.*, 571 S.W.3d at 222 (internal quotation and citation omitted). Nevertheless, in this instance we grant review *ex gratia*.

All rule references are to Missouri Court Rules (2019).

[2] Hitchcock's wife passed away shortly after this incident. Hitchcock remarried in August 2015.

2

friend asked her mother for advice, who recommended Victim talk to the school counselor. Victim later disclosed some of the abuse to her friend's mother.

Thereafter, law enforcement and representatives from the Children's Division came to Victim's home on several occasions. Children's Division staff would "interview" Victim: *i.e.*, with Victim and Hitchcock in the same room, announce the source and the content of the abuse report to which they were responding, and Victim would deny the abuse. Victim also did not disclose Hitchcock's abuse to law enforcement when they stopped by the house, or to school officials when asked, weighing that "with how rough [Hitchcock] was being, [Victim] didn't want to push it."

When Children's Division or law enforcement would leave the house, Hitchcock and the rest of the family would accost and blame Victim, and insist that she "lie" to prevent further inquiry.

In 2014, Victim began acting out and having problems with drugs and stealing medication. A school resource officer referred Victim to the Juvenile Office in April 2014, when allegations surfaced that Victim brought controlled substances to her school and "was distributing those to other students." The record reflects that Victim was charged with a class C felony in connection with this allegation, and that Victim "stipulated to those charges and was placed on formal probation." As a special condition of probation, Victim was to "attend counseling"; obtain "an assessment at CSTAR";[3] and "follow any recommendations" associated therewith.

The juvenile officer assigned to Victim's case had a distinctive "first impression . . . that's carried with me," in that he observed Victim with Hitchcock in the hallway, and "she was very much enclosed on herself, eyes to the floor, shoulders in, curled up, which was unusual in my

---

[3] A child substance abuse treatment center.

experience with the kids I dealt with." As the juvenile officer went through Victim's probation requirements, Victim voiced no objections. By contrast, Hitchcock strongly resisted "the counseling requirement and the CSTAR requirement," and "consistently" tried to answer for Victim. This pattern continued at future meetings—Hitchcock would try to answer for Victim "across the board[.]" The juvenile officer referred Victim to a counselor (to which Hitchcock objected, approximately a month after counseling began, "right in the middle of . . . [the] necessary rapport-building" stage).

Victim began seeing the counselor in May 2014. The counselor observed Victim and Hitchcock in the waiting room at her first appointment—Victim was sitting in a "fetal position[,]" turned away from Hitchcock. During the session, Victim could not make eye contact, and barely spoke above a whisper. When Victim had difficulty responding, Hitchcock would "hit her . . . on her arm[,]" startling Victim and making her jump. Victim's responses to a subsequent depression assessment reflected a "very severe" depression score. Meanwhile, Hitchcock's attitude throughout his attendance at these sessions was "sarcastic [and] dismissive."

The counselor made a hotline call based on a disclosure Victim made in one of her sessions. At the following session, Hitchcock "was very upset," and (in front of Victim) demanded the counselor "tell him if [counselor] hotlined and who hotlined and what was said and if [counselor] could be trusted." Hitchcock was "[c]onfrontational, sitting forward, his finger pointing, yelling, [and] interrogating."

On October 29, 2014, Hitchcock "confront[ed] a developmentally delayed client who was waiting in [counselor's] reception room[.]" Counselor observed this and intervened. Hitchcock "got very upset, was yelling, stomping his feet, shaking his arms, wagging his head, telling

4

[counselor] he could say whatever he wanted wherever he wanted[.]" Counselor eventually persuaded Hitchcock to leave.

At another session, counselor observed a large and untreated wound to the inside of Victim's arm. It appeared to be a severe burn—counselor could see "muscle and tendon[.]" Victim asked counselor if she "had Band-Aids," and counselor provided the first-aid kit in her office. Counselor reported this to Victim's juvenile officer.

In March 2015, Victim's juvenile officer and representatives from Children's Division responded to a hotline call (reflecting physical and sexual abuse) and interviewed Victim at her school. Victim made no disclosures as she was fearful that the only result "would just be more hotline[]" calls. Victim called Hitchcock as he had directed her to do if she was ever questioned without him. Hitchcock arrived at the school—Victim's juvenile officer and the school's resource officer heard Hitchcock's voice "from the lobby outside of the office[]" in which they were seated. Hitchcock was "loud" and "demanding," insisting on an explanation as to why they "were talking to [Victim] without him present."

In April 2015, Victim's probation was revoked due to another incident at school. Victim was given an indeterminate sentence and committed to the Division of Youth Services.[4] Victim was then placed in Delmina Woods, a group home for girls. Victim participated satisfactorily in the programs at that facility, and disclosed some of her abuse. Victim consented to a forensic interview at CAC, which was held on July 28, 2015. Based on the results of the interview, it was

---

[4] Thereafter, Hitchcock and his new wife approached the counselor (in Victim's presence) about how to get Victim out of going to the Division of Youth Services. Counselor directed that "at this time it was a moot point, that most likely the judge would order it[.]" Hitchcock "about ripped [counselor's] door off [her] office[.]" Counselor's "certificates and awards on the wall were shaking." Counselor later observed that this outburst reflected Hitchcock's anger "[t]hat he was going to lose control of [Victim]."

determined that it would be unsafe for Victim to return home, and that Victim would stay at Delmina Woods.

On September 4, 2015, Victim was released from Delmina Woods, but remained in "aftercare" until October 26, 2015, when she was released by the Division of Youth Services. Victim was placed in a foster home, and never returned to live with Hitchcock. Victim's juvenile officer met with her thereafter, and observed that she was substantially more talkative, upbeat, and made much better eye contact.

Hitchcock was charged, by third amended information, with five counts of forcible sodomy (Counts I, III, XII, XV, and XVIII), pursuant to section 566.060;[5] or in the alternative, five counts of statutory sodomy in the first degree (Counts II, IV, XIII, XVI, and XIX), pursuant to section 566.062; six counts of the class C felony of endangering the welfare of a child (Counts V, VIII, XI, XIV, XVII, and XX), pursuant to section 568.045; two counts of forcible rape (Counts VI and IX), pursuant to section 566.030; or in the alternative, two counts of statutory rape (Counts VII and X), pursuant to section 566.034.

A jury trial commenced on June 4, 2018. Victim testified during the State's case in chief, at which time the following colloquy occurred:

[Prosecutor:]   Were there times you ever saw [Hitchcock] hurt somebody else?

[Victim:]       Yes.

[Prosecutor:]   Can you tell me about one of those times?

                [Defense]:      Judge, may we approach?

                BY THE COURT:      Yes.

(the following proceedings were held at the bench:)

---

[5] All references to statutes are to RSMo (2000) unless otherwise specified.

[Defense]:     Judge, we just want to renew our objection as to prior bad acts at this point.  This is where I'm assuming she's getting into other incidents of abuse; not just towards her, but towards other people, and so we are going to renew our objection that this is more prejudicial than probative.  It's one thing to talk about what happened to her and why she is, but to talk about potential evidence, it's -- my clients [sic] aren't charged with any other assault versus anybody else . . . .  Especially if its towards [Hitchcock's first wife], we have -- she's not here to even testify to confirm or deny any of the allegations that may be made, and so we want to renew our objection and make that a continuing objection to any what would be considered prior bad acts.

BY THE COURT:     [Prosecutor]?

[Prosecutor]:   And, Your Honor, so this goes to, again, a reason for a delay in disclosure.  It also goes to forcible compulsion.  I have asked her specifically if she witnessed him hurt somebody else.  I'm not asking her things that she heard about, but things that she personally observed that would have been something that she took into consideration in making a determination whether to disclose or not.

BY THE COURT:  All right, thank you.  The Court did previously look at all the cases and will overrule your objection at this time.  I have looked at the cases and I have weighed the probative versus prejudicial value.

[Defense]:  And can we show that as a continuing objection to any of this type of conduct as to any other violence or uncharged acts?

BY THE COURT:  Yes.

[Defense]:  Thank you.

(the proceedings returned to open court)

[Prosecutor:]   So again, [Victim], was there ever a time that you saw the defendant hurt someone else?

[Victim:]       Yes.

[Prosecutor:]   Can you tell me about one of those times?

[Victim:]       I have seen him throw things at my mom, I've seen him be mean to my older brother, I've seen him smash a can, like a trashcan, over my little brother's head.

7

Later in the State's case in chief, during the testimony of Fallon Givans (a service coordinator with the Division of Youth Services) the following colloquy occurred:

> [Prosecutor:] Okay. Was there any discussion about the fact that a hotline call had been placed from Delmina?
>
> [Witness:] No.
>
> [Prosecutor:] Okay. And then what happens following the transition planning meeting?
>
> [Witness:] I remember -- of course, at some point shortly thereafter the transition meeting, -- I don't have the exact date on that, Children's Division substantiated the al--
>
> [Defense]: Objection, Your Honor.
>
> [Witness:] I'm sorry.
>
> BY THE COURT: Sustained
>
> [Defense]: May we approach?
>
> (the following proceedings were held at the bench :)
>
> [Defense]: Not only am I going to object, but I have to move for a mistrial at this point.
>
> [Prosecutor]: I would ask that you just admonish them not to -- to disregard that. I don't know that it is the basis for a mistrial to do the -- and then we had [the juvenile officer], who testified previously that something was unsubstantiated.
>
> [Defense]: Right, and that was -- I mean, obviously that was talking about a different situation. We're talking right here about the time of the incident, we're talking about the specific allegations of abuse, we're talking about the very nature of the charges that we're here on today.

After hearing substantial argument from both parties, the trial court instructed the jury to disregard the last answer of the witness.

Hitchcock testified in his own defense. He admitted to "smack[ing]" Victim in the mouth; "grab[bing]" her; using "a switch, a paddle, or a belt" to hit Victim; going into Victim's bedroom

8

with the door closed "for several hours with [Victim]"; "wiping [Victim] down with a rag [when] she did not have a shirt on, . . . wiping her backside . . . and her front side"; and having Victim sleep in the same bed with him after Hitchcock's first wife died.

Hitchcock made motions for judgment of acquittal at the close of the State's evidence, at the close of Hitchcock's evidence, and at the close of all the evidence. The trial court denied all these motions.

The jury found Hitchcock guilty of five counts of forcible sodomy (Counts I, III, XII, XV, XVIII), six counts of endangering the welfare of a child (Counts V, VIII, XI, XIV, XVII, XX), and two counts of forcible rape (Counts VI, IX).

Hitchcock waived jury sentencing. The trial court sentenced Hitchcock to seven life sentences; and six, seven-year sentences. The life sentences were to run consecutively to each other. The seven-year sentences were to run concurrently with each other, but consecutively to the life sentences.

On June 26, 2018, Hitchcock filed a motion for new trial. After hearing argument, the trial court took the motion under advisement. The trial court denied the motion on September 12, 2018. This appeal followed.

In four points on appeal, Hitchcock asserts as follows: In Points I and II, that there was no substantial evidence to support Hitchcock's convictions; in Point III, that the trial court "erred in overruling [Hitchcock]'s objection to [Victim]'s testimony about past physical abuse or allegations of past assaultive behavior of [Hitchcock] toward [Victim]"; and in Point IV, that the trial court plainly erred in "permitting the State to introduce evidence through Fallon Givans that the Children's Division had substantiated the al--."

9

**Principles of Review**

In an appeal of a jury-tried criminal case, we view

> [t]he evidence and all reasonable inferences therefrom . . . in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict. This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt.

*State v. Stewart*, 560 S.W.3d 531, 533 (Mo. banc 2018) (internal quotations and citations omitted).

### *Points I & II: Substantial Evidence Supports Convictions*

Hitchcock's Points I and II (and their attendant arguments) are identical, with the sole exception that in his Point II argument, Hitchcock adds the following two sentences: "The witnesses presented by the defense were not inconsistent internally nor externally. They showed a clear picture of the family dynamics and the issues there [sic] were going on in the home." These two sentences add nothing to the substance of Hitchcock's argument, and we therefore take these points together as a single argument.

Sufficiency of the evidence and against the weight of the evidence "are distinct claims[,]" and "must appear in separate points relied on in the appellant's brief to be preserved for appellate review." *Ivie v. Smith*, 439 S.W.3d 189, 199 n.11 (Mo. banc 2014).[6] Furthermore, appellate courts do not entertain against the weight-of-the evidence-challenges in criminal cases. *See State v. Ingalsbe*, 557 S.W.3d 515, 518 n.4 (Mo.App. S.D. 2018). Hitchcock's commingling of a prohibited against-the-weight challenge with his sufficiency-of-the-evidence challenge drastically undercuts the efficacy of his point.

---

[6] Hitchcock's Points I and II are multifarious in that they each purport to challenge the evidentiary sufficiency of all of his convictions: five counts of forcible sodomy; six counts of endangering the welfare of child in the first degree; and two counts of forcible rape.

In a criminal appeal, an appellant's challenge to the sufficiency of the evidence requires appellant to complete three distinct analytical steps:

1.      Identify a challenged factual proposition needed to sustain the conviction;

2.      Identify all favorable evidence in the record tending to prove that proposition; and

3.      Show why such evidence, when considered along with its reasonable inferences, is so non-probative that no reasonable fact-finder could believe the proposition.

*State v. Finch*, 398 S.W.3d 928, 929 (Mo.App. S.D. 2013).

Rather than proceed in accord with *Finch*'s sequence, Hitchcock argues that "[o]verall, [Victim]'s testimony was internally inconsistent and inconsistent with other witnesses testimony." Hitchcock does not formulate an argument that there was insufficient evidence as to any particular conviction or any particular element thereof. Instead, he effectively lumps his thirteen convictions together, and posits that this Court should reverse all of those convictions because Victim "is not a credible witness and therefore cannot be believed." This is a wholly unproductive (and unavailing) line of argument. The circumstantial evidence rule,[7] the destructive contradictions doctrine,[8] and the corroboration rule have all been rejected, and "[a]ny purported inconsistency in the testimony was an issue for the jury to resolve[.]" *Ingalsbe*, 557 S.W.3d at 520. The fact-finder, not the appellate court, decides matters "relat[ing] to the reliability, credibility, or weight afforded to the witnesses' testimony[.]" *Id.* at 520.

As the State indicates (and the record confirms), Victim provided direct and detailed testimony on the elements of each charge against Hitchcock. Hitchcock's argument fails to

---

[7] *See State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993); *State v. Plopper*, 489 S.W.3d 848, 850 (Mo.App. S.D. 2016).

[8] *See State v. Porter*, 439 S.W.3d 208, 213 (Mo. banc 2014).

11

confront and dispel the probative value of that evidence in line with our standard of review. As such, his sufficiency-of-the-evidence challenge is unavailing. Hitchcock's Points I and II are denied.

### Point III: Evidence of Uncharged Misconduct

In his third point, Hitchcock argues that the trial court "erred in overruling [Hitchcock]'s objection to [Victim]'s testimony about past physical abuse or allegations of past assaultive behavior of [Hitchcock] toward [Victim][.]"

> We review trial court decisions regarding the admission or exclusion of evidence for abuse of discretion. . . . [T]he trial court is said to abuse that discretion when its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.
>
> To succeed on appeal, an appellant must also show that the trial court's abuse of discretion was so prejudicial that it deprived the defendant of a fair trial. Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial. We evaluate prejudice based on the whole record.

*State v. Selph*, 568 S.W.3d 561, 568–69 (Mo.App. S.D. 2019) (internal quotations and citations omitted). As to Hitchcock's particular challenge, while evidence of uncharged crimes is generally inadmissible, it may be admitted where "such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial." *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011). To that end,

> [s]uch evidence may be admissible if it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; or (5) the identity of the person charged with commission of the crime on trial. In addition, evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged may be admissible to present a complete and coherent picture of the events that transpired.

*Id.*

12

In pre-trial argument, the prosecutor indicated that she planned to ask Victim about Hitchcock's abuse of other family members. The prosecutor explained that the rationale for adducing such evidence was "why there would be a delay in disclosure. It also goes to the element of forcible compulsion if [Victim] has herself been physically abused or witnessed physical abuse in the home." Defense counsel objected stating, "it's a version of propensity in some form or another, but not necessarily being called that. We believe that it is an uncharged prior bad act and Mr. Hitchcock is and has not been charged with any sort of physical abuse regarding any of the other instances. . . . At the very least, we would ask that it not be brought out in opening statement." The trial court requested that the parties provide case law on the issue, and indicated that it would take up the issue again in the morning after reviewing those cases.

The State sent some cases to the trial court that evening.[9] The next morning, the trial court heard additional arguments from both parties, and then explained its ruling as follows:

> I did review all of the cases sent by the State. I agree that the defendant does have a right to be tried for the act that he is here on today, but I think everything that [the prosecutor] has cited to me as a reason why this evidence should come in has been previously allowed in and, in fact, the State versus Miller case is almost right on point. That's a Supreme Court case from July 3rd, 2012, regarding some of the same facts as we're dealing with here today. As a general rule, what the cases say, evidence of uncharged misconduct is inadmissible for the purpose of showing a propensity to commit such crimes; however, evidence of the defendant's prior misconduct is admissible when it is logically relevant, has some legitimate tendency to directly establish the accused's guilty [sic] of the charges for which he is on trial, and when it is legally relevant, its probative value outweighs its prejudicial effect, which is obviously our evidence standard, and it can be used to establish motive and intent. The cases are clear on that. One of the cases that [the prosecutor] sent, prior sexual conduct toward the victim is admissible as it tends to demonstrate the sexual desire for the victim, thereby establishing motive. And some of the exceptions to the admissibility of prior misconduct include the use of evidence to prove motive, intent, absence of mistake or accident, a common scheme or plan, or the identity of the person charged, and [the prosecutor] has stated many of those reasons here today why this evidence should come in. On the State versus Miller case, I did note that the Court limited the victim to the abuse that she endured herself and that she saw herself, and so I would ask that you do that. I think that's

---

[9] There is no indication in the record that defense counsel sent case law to the trial court that evening on this issue.

13

safe to keep us inside the balancing test for legally relevant, whether or not our evidence is prejudicial to the defendant. In that case, as well, in State versus Miller, the State did not elaborate on it during opening and it didn't comment on it but briefly in closing, so I caution the State just to be careful to make sure that our balancing doesn't get out of whack. All right? So I will allow that.

During the State's case in chief, the following colloquy occurred:

[Prosecutor:]   Were there times you ever saw [Hitchcock] hurt somebody else?

[Victim:]       Yes.

[Prosecutor:]   Can you tell me about one of those times?

[Defense]:      Judge, may we approach?

BY THE COURT:      Yes.

(the following proceedings were held at the bench:)

[Defense]:      Judge, we just want to renew our objection as to prior bad acts at this point. This is where I'm assuming she's getting into other incidents of abuse; not just towards her, but towards other people, and so we are going to renew our objection that this is more prejudicial than probative. It's one thing to talk about what happened to her and why she is, but to talk about potential evidence, it's -- my clients [sic] aren't charged with any other assault versus anybody else . . . . Especially if its towards [Hitchcock's first wife], we have -- she's not here to even testify to confirm or deny any of the allegations that may be made, and so we want to renew our objection and make that a continuing objection to any what would be considered prior bad acts.

BY THE COURT:      [Prosecutor]?

[Prosecutor]:   And, Your Honor, so this goes to, again, a reason for a delay in disclosure. It also goes to forcible compulsion. I have asked her specifically if she witnessed him hurt somebody else. I'm not asking her things that she heard about, but things that she personally observed that would have been something that she took into consideration in making a determination whether to disclose or not.

BY THE COURT: All right, thank you. The Court did previously look at all the cases and will overrule your objection at this time. I have looked at the cases and I have weighed the probative versus prejudicial value.

[Defense]: And can we show that as a continuing objection to any of this type of conduct as to any other violence or uncharged acts?

14

BY THE COURT:  Yes.

[Defense]:  Thank you.

(the proceedings returned to open court)

[Prosecutor:]  So again, [Victim], was there ever a time that you saw the defendant hurt someone else?

[Victim:]  Yes.

[Prosecutor:]  Can you tell me about one of those times?

[Victim:]  I have seen him throw things at my mom, I've seen him be mean to my older brother, I've seen him smash a can, like a trashcan, over my little brother's head.

Hitchcock argues that the above testimony was inadmissible because Victim "testified that she told [Hitchcock] she was not afraid of him."  As relevant here, Victim testified that on one occasion, Hitchcock made inappropriate sexual advances toward her, she resisted, and then Hitchcock initiated progressively more severe acts of assault against Victim, declaring that his intention was to make Victim afraid of him, and after each assault demanding to know if Victim was afraid of him yet.  The fact that Victim testified to having said "no" each time does not prohibit the fact-finder from inferring that Victim was actually afraid (both at the time, and thereafter), and does not vitiate the relevance of the challenged testimony, recited *supra*.[10]  As such, this testimony was admissible for purposes of giving a complete and coherent picture of the events that transpired—namely, of demonstrating forcible compulsion, and to explain Victim's delay in reporting.

The trial court did not abuse its discretion in admitting this evidence.  Point III is denied.

---

[10] The jury has the right to credit some, all, or none of the evidence.  **State v. Roberts**, 465 S.W.3d 899, 901 (Mo. banc 2015).  Further, the jury could properly infer, for instance, that Victim did not want to disclose her fear to Hitchcock, from the reasonable suspicion that acceding such to her abuser would further empower him to engage in even more severe abuse in the future.

15

*Point IV: Testimony Regarding Investigation of the Children's Division*

In his fourth point, Hitchcock argues that the trial court plainly erred in "permitting the State to introduce evidence through Fallon Givans that the Children's Division had substantiated the al--."[11]  He asserts that this (1) invaded the province of the jury, and was (2) improper bolstering of Victim's testimony.

The relevant portion of the challenged proceedings are as follows:

[Prosecutor:]  Okay.  Was there any discussion about the fact that a hotline call had been placed from Delmina?

[Witness:]    No.

[Prosecutor:]  Okay.  And then what happens following the transition planning meeting?

[Witness:]    I remember -- of course, at some point shortly thereafter the transition meeting, -- I don't have the exact date on that, Children's Division substantiated the al--

[Defense]:    Objection, Your Honor.

[Witness:]    I'm sorry.

BY THE COURT:    Sustained

[Defense]:  May we approach?

(the following proceedings were held at the bench :)

[Defense]:    Not only am I going to object, but I have to move for a mistrial at this point.

[Prosecutor]:  I would ask that you just admonish them not to -- to disregard that.  I don't know that it is the basis for a mistrial to do the -- and then

---

[11] The transcript reflects that defense counsel's timely objection terminated witness's answer mid-word.  Counsel also requested relief at that time.  We also observe that Hitchcock, in his motion for new trial, challenged that "[t]he trial court erred in not granting a mistrial when Fallon [Givans] answered that Children's division had substantiated the claim of abuse."  It is unclear why Hitchcock's point challenges for plain error (as an unpreserved claim of error) rather than for abuse of discretion (as a preserved claim of error).  Regardless, this is not decisive, as Hitchcock's claim would fail under either standard.

we had [the juvenile officer], who testified previously that something was unsubstantiated.

> [Defense]: Right, and that was -- I mean, obviously that was talking about a different situation. We're talking right here about the time of the incident, we're talking about the specific allegations of abuse, we're talking about the very nature of the charges that we're here on today.

Additional argument followed. The trial court then stated: "Let's take a break and give you both the opportunity to look at it and I will do the same." The trial court gave the jury a recess instruction, and the trial court and parties apparently performed independent research on this issue. The trial court then heard significant argument from the parties out of the jury's presence.[12] At the terminus of that argument, the trial court indicated: "If the Court simply states, 'The jury is instructed to disregard the last answer as stated by the witness,' does that suffice? I understand you still keep your objection and your request for mistrial, but as far as the curative instruction goes, are you satisfied with that?" Defense counsel replied, "Yes, Your Honor."

After calling the jury back and accounting for the delay in proceedings, the trial court stated as follows: "Ms. Givans, I will remind you that you remain under oath. The jury is also instructed to disregard the last answer as stated by the witness."

Defense counsel timely objected, and stopped the witness from reaching the substantive part of her answer. The record reflects that the trial court performed its own research, directed the parties to perform their own research, and heard extensive argument from the parties on this issue. The trial court instructed the jury to disregard the witness's answer. "The jury is presumed to follow the trial court's instructions." *State v. McFadden*, 369 S.W.3d 727, 752 (Mo. banc 2012). "[S]peculative allegations do not overcome [that] presumption[.]" *Id.* Hitchcock expends much time on how the witness's incomplete answer (to the extent the jury could deduce its substance

---

[12] The transcript reflects that the recess lasted nearly an hour, and the post-research arguments amount to fourteen transcript pages.

were it completed) should not have come into evidence. His analysis, however, fails to accommodate (or overcome) the presumption that the jury followed the trial court's instruction to disregard the witness's answer.[13] Hitchcock's argument is therefore unavailing. Point IV is denied.

The judgment of the trial court is affirmed.

WILLIAM W. FRANCIS, JR., J. - OPINION AUTHOR

GARY W. LYNCH, P.J. - CONCURS

NANCY STEFFEN RAHMEYER, J. - CONCURS

---

[13] Hitchcock argues that the "jury was fully capable of drawing conclusions as to whether [Hitchcock] committed the alleged crimes without Givans' [testimony] that the Children's Division had already [']substantiated the [al--.'"] Indeed, the record—in accord with our standard of review and applicable presumptions—directs that the jury *could*, and *did*.

18